**Affirmed and Memorandum Opinion filed July 9, 2013.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

---

**NO. 14-13-00115-CV**
**NO. 14-13-00147-CV**

---

## IN THE INTEREST OF Z.C.J.L AKA Z.C.J.V., A CHILD

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-82298**

---

## M E M O R A N D U M    O P I N I O N

In this double appeal, Mother and Father appeal the termination of their parental rights to Z.C.J.L. Mother brings one issue claiming the trial court impermissibly commented on the evidence. Father brings three issues claiming the evidence is legally and factually insufficient to support termination of his parental rights. We affirm.

# I. PROCEDURAL BACKGROUND

Z.C.J.L. was born in May 2009 to Mother and Father, who were not married and did not live together. The Department of Family and Protective Services became involved with this case on February 2, 2010, after it had received a referral alleging neglectful supervision by Mother. After an investigation by the Department, the case was transferred to Family Based Safety Services ("FBSS"), which is a division in the Department that is dedicated to family preservation with the primary goal of reuniting the family. Z.C.J.L. was placed with Mother's cousin. On July 8, 2011, the Department filed an original motion to modify conservatorship, in which it sought temporary conservatorship of Z.C.J.L., and a petition to terminate Mother's and Father's parental rights. On July 28, 2011, the trial court appointed the Department temporary conservator of Z.C.J.L., who remained in the same placement with Mother's cousin.

Originally, this case went to trial in October 2012, but ended in a mistrial. The case was tried before a jury to a verdict in January 2013. The jury found by clear and convincing evidence that both Mother's and Father's parental rights should be terminated. On January 24, 2013, the trial court signed the judgment appointing the Department sole managing conservatory and terminating Mother's and Father's parental rights.

## II. FACTUAL BACKGROUND
### A. Mother

Mother had a history of drug use and criminal convictions. Mother was convicted for indecent exposure in 1991; operating a sexually-oriented business in 1992; prostitution in 1992 (twice) and 1998; possession of cocaine in 2001; and fraudulent use/possession of identifying information in 2003. Mother was also arrested for burglary of a habitation in 1998.

2

Tina testified that she met Mother through prostitution.[1] According to Tina, both she and Mother used drugs and would tell each other about men who gave them money in exchange for sex. Tina stated that Father was one of those men. Father met Tina in 2000. Father was also the biological father of Tina's son, C.F.H. Father and Mother met in 2008. Tina testified that she and Mother used drugs at Tina's house while Father was living with Tina. Specifically, Tina and Mother used drugs in the house ten or eleven times while Father was in the back room. This occurred before, while, and after Mother was pregnant with Z.C.J.L. Tina stated that Father knew she and Mother were using drugs. Tina further testified that Mother was taking money from Father for sex two or three times a week before, during, and after her pregnancy with Z.C.J.L.

Mother admitted she had been previously convicted of prostitution, but claimed that neither Father nor other men paid her for sex because she had a job as a live-in caregiver. Mother further testified that Father did not know about her and Tina's use of drugs in his home.

Father denied that his relationship with Tina involved his paying her for sex. Father claimed that he did not know that either Tina or Mother had gone to jail for prostitution and drugs during the time he had known them or that Tina or Mother had used drugs.

On December 28, 2009, the trial court issued an agreed child support review order (1) establishing Father as the biological father of Z.C.J.L.; (2) appointing Mother and Father as joint managing conservators of Z.C.J.L.; (3) giving Mother the right to designate Z.C.J.L.'s primary residence; and (4) ordering Father to pay monthly child support of $220.

---

[1] To protect identity of the child and other minors in this case, we use pseudonyms for certain witnesses.

3

Tina described an incident where Z.C.J.L. fell off the couch when she was about four to six months old. According to Tina, Mother, who was at Tina's house, left Z.C.J.L. unattended on the couch while she went to back room "to get high." Tina was in the kitchen cooking and heard something fall. Z.C.J.L. had fallen off the couch. Tina told Father, who was not there at the time, about Z.C.J.L.'s fall. Tina stated that Father contacted the Department about Z.C.J.L.'s fall, although not "right then and there." Mother admitted that Z.C.J.L. fell off the couch, but denied that she was smoking crack in the house at that time. Father claimed that Tina did not tell him that Z.C.J.L. had fallen off the couch and he did not call the Department about the incident.

On February 2, 2010, the Department became involved with this case after receiving a referral alleging neglectful supervision by Mother. According to the allegation:

> [Z.C.J.L.] fell today while being carried by mother when mother was under the influence of drug(s). Child fell down three steps and landed on her head or back. Mother simply picked child up and put her back into her carrier and left. Mother is using multiple illegal substances while child is in her care.

Z.C.J.L., who was nine months old at that time, was placed with Mother's cousin, Anne. After an investigation by the Department, the case was transferred to FBSS. Mother and Father each received a family service plan from FBSS.[2] The service plans contained requirements for Mother and Father to complete in order to be reunited with Z.C.J.L.

Agatha Sacks, the Department caseworker who had the case from April 2011 to July 2011, testified that, although the case had been in FBSS for over a year, neither Mother nor Father was in substantial compliance with their respective

---

[2] The FBSS family service plans given to Mother and Father are not in the appellate record.

service plans. The average length of time a case is in FBSS is three to six months. Sacks explained that neither Mother nor Father was able to demonstrate what they had learned from the classes they had taken as part of their plans. Moreover, Mother tested positive for drugs. According to Sacks, due to the high level of PCP in Mother's system and her failure to stay in contact with the Department, the Department decided it would be in the child's best interest to have temporary managing conservatorship of Z.C.J.L.

On July 8, 2011, the Department filed an original motion to modify conservatorship, in which it sought temporary conservatorship of Z.C.J.L., and a petition to terminate Mother's and Father's parental rights. On July 28, 2011, the trial court appointed the Department temporary conservator of Z.C.J.L. Z.C.J.L. remained in the same placement with Anne. Mother and Father received new family service plans with requirements for them to meet in order to have Z.C.J.L. returned.

Kamil Ishola, who became the primary Department caseworker in September 2012, testified that Mother did not complete her family service plan.[3] According to Ishola, the only item Mother completed was the psycho-social assessment; however, Mother did not follow the recommendations from the

---

[3] Mother's service plan required that she: (1) enter and complete a ninety-day in-patient substance abuse treatment program and follow all recommendations; (2) participate in individual therapy sessions to address coping skills; (3) maintain independent, safe, and secure housing for at least six months and provide proof of housing; (4) attend court hearings, permanency conferences, and other meetings regarding her case and the child; (5) complete a drug and alcohol assessment and follow all recommendations; (6) participate in, and complete, a nine-week parenting class and demonstrate what she learned; (7) participate in a psycho-social assessment and follow all recommendations; (8) participate in random drug testing; (9) participate in individual counseling and group therapy to address history of abuse/neglect; (10) maintain regular employment and provide proof of employment in the form of paycheck stubs; (11) develop a strong relapse prevention plan; (12) attend NA/AA meetings at least three days per week and provide weekly sign in sheets; (13) obtain a female sponsor with at least three years sobriety; and (14) provide honest accurate information to the agency and the courts.

assessment. Ishola received some certificates for completed classes regarding the requirements of the service plan Mother received from FBSS, but they did not fulfill the requirements of the family service plan Mother received after the Department had taken custody of Z.C.J.L. in July 2011.

Mother continued to have involvement in the criminal justice system after the Department's involvement. Mother was convicted of escape and theft on January 31, 2011, for which she received thirty days in county jail for each offense. Mother was convicted of possession of a controlled substance on November 3, 2011, for which she was arrested on July 18, 2011. Mother was released from state jail on March 2, 2012, after serving time for the possession conviction. At the time of the termination trial, Mother was in jail on a theft charge, but had not gone to trial on that charge.

Mother also continued to use drugs and tested positive for cocaine and PCP in May 2012 and September 2012. Mother admitted under oath at a September 6, 2012 hearing that she had used PCP only two days prior to the hearing. Mother was required to pass a drug test before she could have visitation with Z.C.J.L., but she was never able to achieve a clean drug test. As a result, Mother had not visited Z.C.J.L. for two years. Finally, Mother admitted that she never paid any of the $100 monthly court-ordered child support to Anne for Z.C.J.L.'s care.

Mother agreed that it would be best for Z.C.J.L. to remain in her placement with Anne until Mother was clean from drugs. Although Mother admitted she was not in a position to have Z.C.J.L. in her possession, she nonetheless asked that her rights not be terminated.

### B. Father

In addition to Father's history of paying prostitutes for services, Father had a

prior history of alcohol and drug abuse. When Father had developed liver problems due to alcohol abuse, Father turned to drugs. Father admitted that he used drugs for twenty years, but had been sober since January 8, 2001. Father spent fifteen days in jail in 2004 for aggravated assault.

The Department also had a case involving Father's other child, C.F.H., about the same time as its case involving Z.C.J.L. According to a contact narrative in the case involving C.F.H:

> CPS became involved when a referral was received alleging that [Tina] smokes crack all day. It was stated that [Father] allows mother to sleep with the drug dealers because he doesn't want to give her money for the crack cocaine. It stated that the father sleeps in his car while the mother is sleeping with drug dealers. The mother takes away father's cell phone so he won't call the police on her. It also reported that the child is on the couch while the mother sleeps with drug dealers. Additionally the mother smokes crack cocaine while the child is in the same room.
>
> The mother's crack cocaine is stored in the house and is accessible to the child. It is unknown if the child has ever ingested any of the mother's drugs. When the mother is under the influence of crack cocaine she is very violent. During the investigation the child was placed outside of the home. Mother admitted to cocaine use and tested positive for cocaine.

Tina, who had been sober since October 2011, completed her services in FBSS, and C.F.H. was returned to her. According to Tina, Father also had a service plan in his case with C.F.H., but he did not complete his service plan, and C.F.H. was not returned to him.

Father did not believe Mother used drugs, but if she were using them, he would have a problem with her having contact with Z.C.J.L. Father never felt that Z.C.J.L. was in danger in Mother's care, and he never made any steps to remove Z.C.J.L. from Mother's care.

7

Ishola testified that Father had completed parenting classes but did not demonstrate learned behaviors that were consistent with the child's age and development capabilities.[4] For example, during visits at Anne's home, Father gave Z.C.J.L. candy even though Anne had asked Father not to. Ishola described the candy as disruptive because it ruined Z.C.J.L.'s appetite before dinner and caused her to behave in a "hyper" manner due to the excess sugar.

Michael Alberty, the court-appointed guardian ad litem, agreed that the candy "was definitely a distraction." Moreover, from what Alberty observed, Father was not able to demonstrate any parenting abilities. According to Alberty, Father could not explain how he "would take care of [Z.C.J.L.] on a typical day." Father suggested that he would take her to school. Other than that, Father "couldn't come up with the ideas himself of what he needed to do to take care of [Z.C.J.L.]," even after he had taken parenting classes.

Alberty also described Father's interaction with Z.C.J.L. as "pretty impersonal." Father would just watch Z.C.J.L., but not talk to her other than to ask her if she wanted another piece of candy. On one occasion when Z.C.J.L. was eating, Father just stood behind her without saying anything, only "touch[ing] her hair a little bit."

Anne also testified that she had not seen any behavior by Father indicating that he knew how to be a parent. With regard to the candy, the problem was that Father would bring and give it to Z.C.J.L. at dinnertime even though Anne had

_____

[4] Father's service plan required that he: (1) complete parenting classes and demonstrate what he learned; (2) maintain stable employment and provide monthly income statements for verification; (3) maintain safe, stable housing for at least six months; (4) follow all recommendations and/or services offered by therapists, service provides, and the Department to help eliminate risk of harm to the child; (5) submit to random drug screenings; (6) complete a drug and alcohol assessment and follow all recommendations; (7) attend all court hearings, permanency conferences, or other meetings regarding his case and the child; and (8) participate in a psycho-social assessment and follow all recommendations.

asked him not to. Father never asked about Z.C.J.L.'s progress or her favorite toys or what he could bring to help out. During Father's visits with Z.C.J.L., he did not interact much with her; he mostly would watch Z.C.J.L. as she played or watched television. When Father visited, Z.C.J.L. did not rush up to him when she saw him. Anne stated that she would not feel comfortable leaving Z.C.J.L. with Father unsupervised.

Tina also testified that Father was not capable of raising Z.C.J.L. According to Tina, Father never participated with any parenting activities for C.F.H. such as dressing, feeding, or playing with C.F.H., and he would not be able to do those things with a toddler.

Ishola further testified that Father maintained stable employment, but did not provide him with the paycheck stubs. Ishola, however, also testified that Father never maintained safe and stable housing. When the case first began, Father was residing in a house on the campus of the NA/AA facility where he had been attending meetings. Father stayed in the house for free as part of his employment with the NA/AA facility. Ishola stated that the house on the NA/AA campus was not appropriate for Z.C.J.L., and he informed Father that he needed to obtain housing suitable for her. Also, there was no room for Z.C.J.L. in the house because Father had a roommate. Ishola testified that Father stated one time in court that he would put a hammock in the house for Z.C.J.L. to sleep in. Alberty agreed that the house on the NA/AA campus was not safe or suitable for a small child.

Father moved into a two-bedroom apartment in July 2012 to establish stable housing. However, Tina and C.F.H lived there, staying in one of the bedrooms. Ishola informed Father that the Department did not agree with parents "cosleeping" with their children.

9

Father moved out of the apartment in December 2012. Tina explained that, because she testified at the first trial in October 2012, Father moved out of the apartment because, by her testimony, she "was going against him." Furthermore, according to Tina, Father stopped paying the rent and had the lights cut off, even though she and C.F.H. were depending on him to pay the rent and utilities. Father returned to the house located on the campus of the NA/AA facility and was living there at the time of trial. Father did not consider the house on the NA/AA campus to be a stable environment for Z.C.J.L.

Father submitted to random drug tests, the results of which were negative. Father's drug and alcohol assessment recommended that he partake in individual psychotherapy and that he have a psycho-social assessment. The psycho-social assessment recommended that Father receive individual therapy and undergo a psychiatric assessment.

Dr. Wafaa Farag conducted Father's psychiatric evaluation. In her report, Dr. Farag recommended that Father (1) have random drug screens; (2) attend a twelve-step program to help attain and maintain sobriety; (3) have a medical evaluation to rule out dementia; (4) apply to Medicaid and MHMRA; (5) remain under psychiatric care for treatment of psychosis; and (6) be monitored for symptoms and referred to a psychiatrist for medication management. Dr. Farag concluded her report with the following: "Given [Father's] history of drug use and his untreated mental illness, I do not recommend reunification."

At trial, Dr. Farag described Father as incoherent during her interview with him. That is, when she asked him a question, he responded with something unrelated to the question. Dr. Farag testified that the lack of coherence suggested that Father "has a severe mental illness." Dr. Farag thought Father "might have had psychosis or dementia." Dr. Farag explained that chronic use of alcohol or

10

drugs could cause dementia or psychosis, even if the person no longer used alcohol or drugs. Dr. Farag opined that reunification would not be in the child's best interest. Father's level of incoherence would be harmful to Z.C.J.L., and Father was not capable of raising a child.

Father never followed Dr. Farag's recommendation to have a medical evaluation to rule out dementia, even though Ishola had discussed the need for the evaluation with him on three occasions. Father recalled a discussion at the December 13, 2012 hearing about the medical evaluation. Father claimed that he would get the medical evaluation "today" if the court allowed it.

Father admitted that he had not paid the $220 monthly child support for Z.C.J.L. since it stopped coming out of his paycheck in February 2011. Father claimed that he was not obligated to pay the monthly child support. Father also stated that he would have the child support taken out of his paycheck if he had an order to take to his employer. Tina testified that Father made sure that part of his social security was being paid to Z.C.J.L.

Ishola testified that the Department was seeking termination of Father's parental rights because he had not successfully demonstrated learned behaviors from his parenting class and he had not provided a stable home for Z.C.J.L. Father, however, claimed that the Department was seeking to terminate his parental rights because "I'm old and I'm Hispanic." Joanna Fisher, the caseworker since October 2012, was concerned that Father believed those were the reasons for the Department's involvement after nearly three years. Father requested that Z.C.J.L. remain with Anne, but that his rights not be terminated because "I am the legitimate father, the blood father."

11

## C. Evidence on Best Interest

Anne, who had been married for nineteen years and had a teenage son and a teenage daughter, testified that Z.C.J.L. was part of their family: "[W]e treat her and we manage our family as if she will be there always. . . . We love her." Anne and her husband wanted to adopt Z.C.J.L. Z.C.J.L. called Anne "Mom, Mommy, [and] Momma." ZCJL calls Anne's husband "Daddy." If Anne and her husband adopted Z.C.J.L., she would be able to have their last name and it would appear that she was part of the family. Anne and her husband wanted Z.C.J.L. to remain in their home even if Mother's and Father's rights were not terminated. If their rights were terminated, Anne stated that she would allow Mother and Father to have contact with Z.C.J.L. because she always intended for Z.C.J.L. to know her biological parents.

The caseworkers and the guardian ad litem agreed that termination of Mother's and Father's parental rights and adoption of Z.C.J.L. by Anne and her husband would be in Z.C.J.L.'s best interest. Ishola testified that neither Mother nor Father had demonstrated that they were capable of meeting Z.C.J.L.'s everyday needs, and neither Mother nor Father wanted Z.C.J.L. placed with them, but for Z.C.J.L. to stay in her placement with Anne. Mother and Father were "asking for what would be the benefits of being parents without any of the responsibility."

Ishola testified that if Mother's and Father's rights were not terminated, Z.C.J.L. could not be adopted and she would remain in the custody of the Department until she was eighteen years old. Fisher explained this meant that the Department would have to visit Z.C.J.L. on a monthly basis. Fisher further testified that only with the termination of the parental rights could the Department achieve its goal of "permanency," which meant Z.C.J.L. would "remain in a safe environment without confusion and chaos."

## D. Verdict & Judgment

The jury found by clear and convincing evidence that both Mother's and Father's parental rights should be terminated. On January 24, 2013, the trial court signed the judgment appointing the Department sole managing conservatory and terminating Mother's and Father's parental rights. The trial court found by clear and convincing evidence that termination of Mother's parental rights was (1) in the child's best interest; and (2) supported by predicate acts under section 161.001(D), (E), (F), (N), (O), and (P) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012). The trial court found by clear and convincing evidence that termination of Father's parental rights was (1) in the child's best interest; and (2) supported by predicate acts under section 161.001(D), (E), and (O). *Id.* The trial court further found that termination of Father's rights was supported by section 161.003 of the Texas Family Code. *See* TEX. FAMILY CODE ANN. § 161.003 (West 2008)

Mother and Father each filed an appeal of the terminations of their parental rights, but do not appeal the appointment of the Department as sole managing conservator of Z.C.J.L. We address their respective appeals separately.

## MOTHER'S APPEAL

In her sole issue on appeal, Mother contends that the trial court impermissibly commented on the evidence during voir dire.

On the first day of trial prior to voir dire, Mother's attorney, Theodore Haynes, Jr., informed the trial court that Mother was in jail. Mother was charged with theft in December 2012. Haynes saw Mother in jail on December 7, 2012, and attempted to see her again on December 10, 2012, but she had made bond on December 8 or 9, 2012. When Mother did not appear for the arraignment on

December 19, 2012, an arrest warrant was issued for her. Haynes did not find out until the morning of the first day of trial that Mother had returned to jail.

Haynes asked the trial court if Mother could appear the next day if he could not get her suitable clothing to wear in court so that she would not have to appear in front of the jury in orange jail clothes. After hearing argument, the trial court stated it would take the request under advisement.

Haynes also presented an oral motion in limine regarding the theft charge for which Mother was in jail. Haynes argued that it would be prejudicial to mention the theft charge because there was no final conviction. After hearing argument, the trial court stated that it would take Mother's oral motion in limine under advisement.

After hearing argument on other matters and taking a recess, the trial court granted Mother's request for her not to appear in jail clothes on the first day of trial because "case law interpretations . . . make it clear that once a defendant objects to that that it is reversible error for me to deny that." The trial court, however, denied Mother's oral motion in limine because her arrest and pending theft charge were relevant to best interest and termination grounds. Because the trial court was going to allow reference of the fact of the pending theft charge through evidence and testimony the court "need[ed] to explain [Mother's] absence so that it can be the subject of voir dire." Specifically, whether any venire member could not be impartial or unbiased because Mother was in jail with a pending theft charge would need to be determined during voir dire.

At the beginning of voir dire, the trial court instructed the venire panel:

> Let me state now: . . . [Mother's] not present today with the permission of the Court for purposes of voir dire and opening statements only for the reason that [Mother] has some other

14

conflicting court requirements in criminal court. I'm going to tell you now, she's been charged with but has not yet gone to trial on a charge of theft — okay — and she's dealing with that now.

\* \* \*

. . . . She's been allowed to be absent with Court permission today only. If you're seated on this panel, you will see her tomorrow before we actually start the trial — okay?

The reasons for her absence — which I thought were important to let you know what they are — is because she's dealing with some criminal charges, only, across the street today but will be here tomorrow. Okay? She has not been convicted. She has not even gone to trial on those matters. Okay? So, you are not to consider her in any way guilty of those charges.

I'll tell you that the charge that she's been charged with is theft. And that's all I'm going to tell you. Except that she is presumed innocent by this Court. You are to presume her innocent, and you will be asked questions during voir dire about whether or not that information and her absence has any bias or prejudice [sic] effect on your ability to hear this case.

\* \* \*

You will be asked questions about that. Okay. This Court I — because I get paid to make the big decisions. I decided that you needed to know why she was absent. Since I told her she didn't need to be here through her counsel — okay — and I needed you to be voir dired on whether or not the reasons for that absence would prohibit you from being able to hear this case. And you're going to be voir dired on that. Okay? That's all you really need to know about that.

If you're on the jury panel, you will see her tomorrow; and she'll be present.

Mother specifically complains of the above-quoted instruction the trial court gave the venire panel at the start of voir dire. Mother, however, does not challenge the trial court's denial of her motion in limine regarding evidence of her incarceration on the then pending theft charge.

15

Mother argues that Article 38.05 of the Texas Code of Criminal Procedure, which prohibits the trial court from discussing or commenting on the weight of the evidence, applies here because "fundamental rights are at risk of deprivation in litigation brought by the state."[5] The Code of Criminal Procedure only applies to criminal proceedings. TEX. CODE CRIM. PROC. ANN. art. 1.02 (West 2005). "[O]ur Rules of Evidence applicable to civil cases and our Rules of Civil Procedure govern termination proceedings." *In re B.L.D.*, 113 S.W.3d 340, 351 (Tex. 2003); *see also Baxter v. Tex. Dep't of Human Res.*, 678 S.W.2d 265, 267 (Tex. App.—Austin 1984, no writ) (holding that the exclusionary rule found in Article 38.23 of the Texas Code of Criminal Procedure was "inapplicable to the present case because the Code of Criminal Procedure applies only to criminal actions, and this is a civil action [for termination of parental rights] arising under the Texas Family Code"). Therefore we do not apply article 38.05 to this civil proceeding.

The Bill of Rights in the Texas Constitution guarantees litigants the right to trial by a fair and impartial jury. *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 749 (Tex. 2006). The Texas Legislature has established the bases for juror disqualification, including bias or prejudice. *Id.* (quoting TEX. GOV'T CODE ANN. § 62.105).

Voir dire examination protects the right to an impartial jury by exposing potential improper juror biases that form the basis of statutory disqualification. *Id.* (citing *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

---

[5] Article 38.05 provides:

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

TEX. CODE CRIM. PROC. ANN. art. 38.05 (West 1979).

The primary purpose of voir dire is to question potential jurors about specific views that may prevent or substantially impair them from properly performing jury duty. *Id.* (citing *Morgan v. Illinois*, 504 U.S. 719, 734–35 (1992)). Voir dire inquiry into potential juror bias and prejudice is proper to determine whether jurors are disqualified by statute. *Id.* at 750. "Statements during voir dire are not evidence, but given its broad scope in Texas civil cases, it is not unusual for jurors to hear the salient facts of the case during voir dire." *Id.* at 753. Trial courts have broad discretion in conducting voir dire. *Babcock v. Nw. Mem'l Hosp.*, 767 S.W.2d 705, 709 (Tex. 1989).

Here, the trial court explained to the parties that, because it was denying Mother's oral motion in limine, a ruling not challenged on appeal, her incarceration and pending theft charge would be proper subjects of voir dire so that the court could determine any bias or prejudice of potential jurors. *See Hyundai*, 189 S.W.3d at 750 (explaining that the purpose of voir dire is to determine the bias or prejudice of potential jurors).[6] We cannot conclude that the trial court abused its discretion by instructing the venire panel that Mother was incarcerated for a pending theft charge.

Even if the trial court abused its discretion by mentioning her incarceration for the pending theft charge, Mother has not shown that such error requires reversal. *See* TEX. R. APP. P. 44.1(a) (providing for reversal of trial court error only if the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the court of

---

[6] We note that a parent's incarceration is relevant to determining termination of parental rights. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op. on reh'g en banc) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child."); *id.* at 558 (holding frequent incarceration leaves the child without a stable environment and without any reliable source of food, clothing, shelter, and emotional support).

17

appeals).

The record reflects that the venire panel was questioned about Mother's absence and the pending theft charge, and that some members were struck for cause on the basis of bias or prejudice due to those issues. Those potential jurors might have been picked to sit on the jury if they had not been questioned about Mother's absence or the pending theft charge.

After the jury had been empanelled, the trial court instructed the jurors that they were not to consider Mother's absence from the first day of trial:

> . . . . You will see [Mother] in the morning. I'm telling you right now, you are to draw absolutely no inference, negatively or otherwise, against [Mother] because she had a commitment that I let her go to today. Okay. She'll be sitting in that chair next to Mr. Haynes in the morning before we start opening remarks. Okay. And you're going to act as if she's been here from the very beginning — okay — because, again, the issue she's handling right now have not gone to trial. She's presumed innocent until proven guilty; and I don't even want you to factor that issue in — the fact that she wasn't here today in. Okay.

Moreover, during opening statements the next day, Haynes downplayed the pending theft charge:

> [MR. HAYNES] Now, there's a reason that the Judge had instructed you in voir dire to disregard pending legal issues that my client has; and there's a legal reason why he did that. And I want to you to keep that in mind.
>
> Now, if my client is asked anything about that, I've instructed her to exercise her Fifth Amendment privilege against compulsory self-incrimination. The case is still pending. There's no final judgment on that case. It's going to be dismissed. I've had many cases dismissed in my legal career as an attorney —
>
> MS. DAVIS [THE DEPARTMENT'S ATTORNEY]: I'm going to object on improper openings at this point.

\* \* \*

18

MR. HAYNES: I wanted to rephrase my prior statement. And what I'm concerned about is the pending legal charges that she has against her now, not all the legal charges that she's ever had against her. I'm talking about what's pending right now because there's not been a final judgment.

So, we have misspoken and said "all criminal charges." What I meant was criminal charges that are pending before her. She's presumed innocent. The Judge told me that in voir dire. Okay. We don't know what's going to happen in this case. There have been many cases that I have dismissed within the last couple of years, criminal cases on the criminal side.

Haynes told the jury that theft case against Mother was "going to be dismissed." After an objection by the Department's attorney and the bench conference that followed, Haynes continued to downplay the theft charge by stating, "We don't know what's going to happen in this case. There have been many cases that I have dismissed within the last couple of years, criminal cases on the criminal side."

Furthermore, as Haynes promised the jury in his opening statement, Mother pleaded the Fifth Amendment and refused to answer the following questions asked by the Department: (1) "You're currently incarcerated?"; (2) "And on what charges are you currently incarcerated?"; and (3) "Is the theft of the Infamil the reason why you're currently incarcerated?"

In a civil action, a jury may draw an adverse inference against a party who pleads the Fifth Amendment. *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 779 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances. *Lozano v. Lozano*, 983 S.W.2d 787, 791 (Tex. App.—Houston [14th Dist.] 1998), *rev'd on other grounds*, 52 S.W.3d 141 (Tex. 2001). Such adverse inference applies to

19

parental rights termination cases. *See In re C.J.F.*, 134 S.W.3d 343, 352–53 (Tex. App.—Amarillo 2003, pet. denied) (stating that "a jury may have drawn adverse inferences from Nathan's and Brenda's refusal to *answer the multitude of questions propounded to them by the Department and C.J.F.'s ad litem*"). Here, the jury was entitled to draw an adverse inference from Mother's refusal to answer questions concerning the fact of her incarceration and the reason for her incarceration.

Finally, the evidence showed that Mother had a criminal history spanning twenty years, including convictions resulting in Mother's incarceration while this case was pending. The jury heard evidence that Mother used drugs, before, during, and after her pregnancy with Z.C.J.L. During the pendency of this case, Mother tested positive for drug use, and admitted she had used drugs two days before a September 2012 hearing. The jury also heard evidence that Z.C.J.L. fell off the couch when left attended while Mother was getting "high," and that the Department became involved when Z.C.J.L. fell when mother was carrying her while under the influence of drugs. Mother had not completed her service plan and had paid none of the court ordered child support to Anne. Ultimately, Mother also admitted that she was in no position to take possession of Z.C.J.L. Mother has failed to show trial court error, if any, in instructing the jury about her absence and pending theft charge probably caused the rendition of an improper judgment.

We overrule Mother's sole issue on appeal.

## FATHER'S APPEAL

In three issues, Father claims the evidence is legally and factually insufficient to support the findings that (1) he violated section 161.001; (2) he suffered from a mental or emotional illness or disability that, in all reasonable probability, would continue to render him unable to provide for the child's needs until her eighteenth birthday pursuant to section 161.003; and (3) it was in the best

20

interest of the child that his parental rights be terminated.

## A. Standard of Review

Involuntary termination of parental rights implicates fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). The termination of the natural right between parents and children "is complete, final and irrevocable." *Id.* Therefore, termination proceedings are strictly scrutinized. *Id.*

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by Section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

Additionally, section 161.003 of the Texas Family Code provides for termination of parental rights if the Department establishes that a parent has (1) a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child; (2) the illness or deficiency, in all reasonable probability, proven by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the eighteenth birthday of the child; (3) the Department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination; (4) the Department has made reasonable efforts to return the child to the parent; and (5) the termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.003(a).

Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008).

21

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 244; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. But we give due deference to the fact finder's resolution of factual questions. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We then determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266.

## B. Section 161.001

In his first issue, Father claims the evidence is legally and factually insufficient to support the finding that Father violated sections 161.001(1)(D), (E), and (O).

Under section 161.001(1)(D), the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(D). "[E]ndanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "A child is endangered when the environment creates a potential for

danger that the parent is aware of but disregards." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under section 161.001(1)(D)." *Id.* Parental and caregiver illegal drug use and drug-related criminal activity supports the conclusion that the child's surroundings endangers her physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Subsection D is not a basis for terminating parental rights if the parent was unaware of the endangering environment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, a parent need not know for certain that the child is in an endangering environment; awareness of such potential is sufficient. *Id.* Subsection D permits termination based on a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Father acknowledges that a parent who knows of and ignores another parent's drug use may be violating subsection (D), but claims the Department did not present any evidence that Father was actually aware of Mother's drug use. Father relies on his own testimony that he did not know of her drug use and testimony by Tina that she and Mother used drugs ten or eleven times while Father was in the back room, and testimony by Mother that she did not think Father knew they were using drugs in his home. However, Tina testified that Father knew she and Mother were using drugs. "One parent's drug-related endangerment of the child may be imputed to the other parent." *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39.

23

Father also relies on his own testimony that if he had known Mother was using drugs, he would have had a problem with her having contact with Z.C.J.L. Father further argues the evidence established that he called the Department after he learned of Z.C.J.L.'s fall. Although Tina testified that she informed Father about Z.C.J.L.'s fall, and Father called the Department about the incident, Father expressly denied that Tina had told him of the incident or that he reported the incident to the Department. Consistent with his testimony that he did not call the Department, Father also stated that he never felt Z.C.J.L. was in any danger in Mother's care and he never took any steps to remove Z.C.J.L. from Mother's care. *See In re M.C.*, 352 S.W.3d 563, 568 (Tex. App.—Dallas 2001, no pet.) (holding father's knowledge of mother's drug use and failure to take any action to remove the children from mother's home was sufficient to support finding under subsection D); *In re M.M.*, No. 2-08-275-CV, 2009 WL 2196129, at *8 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.) (holding evidence of father's knowledge of mother's drug use, among other conditions, was legally and factually sufficient to support finding under subsection D); *In re A.O.*, 2-09-005-CV, 2009 WL 1815780, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.) (holding father's knowledge of mother's use of drugs and failure to take steps to protect the child from such endangering environment was sufficient to support finding under subsection D).

The jury was entitled to resolve conflicts in the testimony about whether Father knew of Mother's drug use and whether Father called the Department. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We conclude, by clear and convincing evidence, that the evidence is legally and factually sufficient to support the finding that Father knowingly allowed Z.C.J.L. to remain in conditions or surroundings which endangered her physical or emotional well-being.

24

Because we hold the evidence is legally and factually sufficient to support the jury's finding on subsection D, we need not address Father's legal and factual sufficiency challenges to the jury's findings on subsections E and O. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").[7]

We overrule Father's first issue.

## C. Best Interest

In his third issue, Father claims the evidence is legally and factually insufficient to support the finding that termination of Father's parental rights is in the best interest of the child.

There is a strong presumption that the best interest of the child is served by keeping the child with the natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department has the burden to rebut this presumption. *In re U.P.*, 105 S.W.3d at 230. To rebut this presumption, there must be clear and convincing evidence of the natural parent's present unfitness. *In re C.J.S.*, 383 S.W.3d 682, 691 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In determining whether termination is in the best interest of the child, we may consider (1) the child's desires; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical

---

[7] Nor do we need to address Father's second issue in which he challenges the legal and factual sufficiency of the evidence supporting the finding under section 161.003 that he suffered from a mental or emotional illness or disability that, in all probability, would continue to render him unable to provide for Z.C.J.L.'s needs until her eighteenth birthday. *See In re C.R.T.H.*, No. 13-13-00032-CV, 2013 WL 1876515, at *6 (Tex. App.—Corpus Christi May 2, 2013, no pet. h.) (mem. op.) (holding it was not necessary to address termination under 161.003(a) because unchallenged findings under sections 161.001(D) and (E) supported termination order).

danger to the child; (4) the parental abilities of the person seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive, nor must all the factors be proved as a condition precedent to terminate parental rights. *In re C.H.*, 89 S.W.3d at 27. The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *In re S.L.*, 188 S.W.3d 388, 393 (Tex. App.— Dallas 2006, no pet.).

Evidence supporting termination under one of the grounds listed in section 161.001(1) supports a finding that termination is in the best interest of the children. *See In re C.H.*, 89 S.W.3d at 27 ("While it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues."). As discussed above, there was evidence that Father left Z.C.J.L. in Mother's care knowing that Mother was using drugs, but failed to take any steps to remove Z.C.J.L. from Mother's care.

Moreover, the need for permanence is the paramount consideration for a child's physical and emotional needs. *In re C.J.S.*, 383 S.W.3d at 691. The goal of establishing a stable, permanent home for a child is a compelling government interest. *Id.* Father testified that he wanted Z.C.J.L. to remain in her placement in Anne's home; he just did not want his rights as Z.C.J.L.'s father terminated. Essentially, Father was "asking for what would be the benefits of being [a] parent[] without any of the responsibility."

A fact finder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered. *Wischer v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151, at *10 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) (citing *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39). By the time of trial, Z.C.J.L. had lived in Anne's home for nearly three years and become part of the family. Anne and her husband wanted to adopt Z.C.J.L. Ishola and Fisher both testified that if Mother's and Father's rights were not terminated, Z.C.J.L. would remain in the Department's custody until she was eighteen years old, which would mean monthly Department visits. Moreover, "permanency" for Z.C.J.L. meant that she would "remain in a safe environment without confusion and chaos."

The evidence also showed that Father was not capable of caring for a small child. According to Alberty, Father could not explain how he "would take care of [Z.C.J.L.] on a typical day." Other than taking her to school, Father "couldn't come up with the ideas himself of what he needed to do to take care of [Z.C.J.L.]," even after he had taken parenting classes. Father was not a co-parent with Tina for C.F.H., and Tina did not believe that Father would be able to dress, feed, or play with a toddler. Father gave candy to Z.C.J.L. around dinnertime during his visits, disrupting her dinner. Father never inquired of Anne regarding how Z.C.J.L. was progressing, what her favorite toys were, or what he could bring to help out. Finally, Dr. Farag opined that Father's level of incoherence would be harmful to Z.C.J.L., and Father was not capable of raising a child.

27

Moreover, Father did not know how to interact with Z.C.J.L. Father's interaction with her was "pretty impersonal." During his visits, Father would mostly watch Z.C.J.L. play, watch television, or eat. The only attempt Father made to talk to Z.C.J.L. was to ask her if she wanted another piece of candy.

For cases in which the Department or another government agency is the petitioner, Section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2008). Section 263.307(b) lists the factors to consider in determining whether a parent is "willing to provide the child with a safe environment." *Id.* § 263.307(b). Those factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate

28

parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.*

The first, sixth, eighth, eleventh, and twelfth statutory factors are relevant to the best-interest inquiry in this case. Z.C.J.L., who was less than four years old at the time of trial, was physically and mentally vulnerable. Dr. Farag testified that Father was incoherent, suggesting that Father "has a severe mental illness," possibly "psychosis or dementia." Father never followed through with Dr. Farag's recommendation that he have a medical evaluation to rule out dementia. Father had a history of alcohol and drug abuse, although he stated that he had been sober for over a decade at trial. Although Mother had a history of drug abuse, and there was evidence that Father knew about Mother's drug use, he did nothing to protect Z.C.J.L. from the endangering environment created by Mother's drug use. Because Father wanted Anne and her husband to continue to take care of Z.C.J.L., it was apparent that Father was not willing to effect positive environmental and personal changes. As detailed previously, the evidence showed that Father lacked parenting skills.

We conclude, by clear and convincing evidence, that the evidence is legally and factually sufficient to support the finding that termination of Father's parental rights to Z.C.J.L. was in her best interest.

29

We overrule Father's third issue.

### III. CONCLUSION

We affirm the trial court's judgment as to both Mother and Father.

/s/ Sharon McCally
   Justice

Panel consists of Justices Brown, Christopher, and McCally.